Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 17, 2003        Decided June 13, 2003

No. 02–3005

UNITED STATES OF AMERICA,
APPELLEE

v.

JOEY C. ALEXANDER,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 00cr00224–01)

———

*Mary M. Petras*, appointed by the court, argued the cause for the appellant.

*Patricia A. Heffernan*, Assistant United States Attorney, argued the cause for the appellee. *Roscoe C. Howard, Jr.*, United States Attorney, *John R. Fisher*, and *Roy W. McLeese III*, Assistant United States Attorneys, were on brief.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: SENTELLE, HENDERSON and TATEL, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The appellant, Joey C. Alexander, seeks reversal of his conviction for the unlawful possession of a firearm and ammunition by a felon, in violation of 18 U.S.C. § 922(g)(1), and, in the alternative, vacatur of the mandatory minimum sentence imposed by the district court. Specifically, Alexander challenges the district court's (1) admission of a 911 call under the "excited utterance" exception to the rule against hearsay; (2) admission of prejudicial "other acts" evidence; (3) denial of his motion for a new trial; and (4) imposition of a mandatory minimum sentence under 18 U.S.C. § 924(e)(1). He also challenges the sufficiency of the evidence. For the reasons set forth below, *see infra* Part II, we affirm the district court's rulings and uphold Alexander's conviction and sentence.

## I. Background

On June 17, 2000, at 5:40 p.m., Yvette Young called 911 from her workplace at 723 12th Street, N.E., in Washington, D.C.[1] She told the emergency dispatcher that the man she was dating had just threatened her at her workplace, told her that he would return to "do something" to her and said that he was going to go to her apartment to "mess" it up. Young also told the dispatcher that her boyfriend had keys to her apartment and that "he also has a gun." When the dispatcher asked, "He got a gun on him now?," Young replied, "Yeah. And I need someone to go to my apartment [until] my mother come[s] [to] pick me up from work to meet me there." The dispatcher told Young that the police would not go to her apartment because, by giving her boyfriend keys to the apartment, she had given him permission to enter. Nevertheless, the dispatcher told Young that she would send the

---

[1] Although Young did not testify at trial, the government played her 911 call for the jury. *See* 2/6/01 Tr. 180. Overruling defense counsel's hearsay objection, the district court ruled that Young's call qualified as an excited utterance. *Id.* at 143–44.

police to her workplace so that Young could "fill out a report for threats."

At approximately 5:52 p.m., MPD Officer Daynell Schaffrath arrived at the group home where Young worked. When Schaffrath met Young at the front door of 723 12th Street, she appeared "stressed, afraid, [and] frightened." 2/6/01 Tr. 155. Soon after Schaffrath interviewed Young about the report,[2] the appellant appeared at the front door. Young then jumped out of her seat, pointed at Alexander and said, "[t]hat's him right there, Officer." *Id.* at 176. Although Schaffrath ordered Alexander several times to step away from the door and to keep his hands away from his body, Alexander refused to comply. Instead, Alexander opened the screen door and began to step inside the room. Schaffrath then stepped toward Alexander, placing herself between him and Young, and radioed for assistance. When Schaffrath raised a can of pepper spray, Alexander finally complied with her orders.

After Schaffrath arrested and handcuffed Alexander, MPD Officer Craig Reynolds arrived at the scene. Reynolds subsequently searched the appellant, recovering $900 in cash, a wallet, a set of keys, a driver's license and a cell phone. Shortly thereafter, Reynolds approached a brown Buick that was parked on the street approximately 50 to 75 feet from the group home. Looking through the windshield, he saw a handgun lying on the floorboard of the car on the driver's side. On the passenger seat, he saw a blue baseball cap.

Crime scene search officer Ronny Arce recovered the loaded weapon—a Colt revolver—from the floorboard and used the keys found on Alexander to start the car. The officers subsequently found the car's registration and a seat

---

[2] At trial, defense counsel asked Schaffrath if, during the interview, Young had stated "that she had seen Mr. Alexander with a gun on him that day?" 2/7/01 a.m. Tr. 76. Schaffrath answered, "No." *Id.* Although Schaffrath also testified during voir dire that Young had told her that Alexander kept a revolver with a brown handle in a nightstand drawer, 2/6/01 Tr. 70, the district court excluded these statements as hearsay, *id.* at 144.

belt citation in the car's glove compartment. The former indicated that the car was registered to Alexander, while the latter indicated that Alexander had received a citation while driving the Buick on April 6, 2000. Both documents listed Alexander's address as 253 16th Street, S.E., Washington D.C., which is located approximately 10 to 14 blocks from 723 12th Street, N.E.

Based on the foregoing events, Alexander was indicted on November 2, 2000 and charged with three counts: one count of unlawful possession of a firearm and ammunition by a felon, in violation of 18 U.S.C. § 922(g)(1); one count of threatening to kidnap, injure or physically damage, in violation of D.C. Code § 22–2307; and one count of tampering with a witness, victim or informant, in violation of 18 U.S.C. § 1512(b)(1). At trial, the district court granted Alexander's motion for judgment of acquittal on the tampering charge at the close of the government's case-in-chief. On February 8, 2001, the jury acquitted Alexander of the threat charge and, the next day, convicted him of the felon-in-possession charge. After denying Alexander's motion for a new trial, the district court sentenced him to 180 months of incarceration, pursuant to 18 U.S.C. § 924(e)(1), followed by five years of supervised release. Alexander now appeals, challenging both his conviction and, in the alternative, his mandatory minimum sentence.

## II. Analysis

We address each of Alexander's challenges in turn.

### A. The Excited Utterance

Alexander objected on hearsay grounds to the introduction of the 911 call and to Schaffrath's testimony regarding Young's subsequent statements at the scene. 2/6/01 Tr. 4–13. After conducting voir dires of Schaffrath, who testified for the government, and Young, who testified for Alexander, the district court ruled that the 911 call—but not Young's subsequent statements to Schaffrath—qualified as an excited utterance and, as such, fell within an established exception to the hearsay rule. *Id.* at 143–44. On appeal, Alexander renews

his hearsay objection to the 911 call, arguing that the statements contained therein were not made while Young was under the stress of excitement caused by Alexander's alleged threat.

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Williams*, 212 F.3d 1305, 1308 (D.C. Cir.), *cert. denied*, 531 U.S. 1056 (2000); *see also United States v. Evans*, 216 F.3d 80, 85 (D.C. Cir.) (inadmissible hearsay allegation reviewed under abuse of discretion standard), *cert. denied*, 531 U.S. 971 (2000). The district court's decision to admit evidence is therefore "entitled to 'much deference' on review." *United States v. Ramsey*, 165 F.3d 980, 984 n.3 (D.C. Cir.) (quoting *United States v. Lewis*, 693 F.2d 189, 193 (D.C. Cir. 1982)), *cert. denied*, 528 U.S. 894 (1999).

Federal Rule of Evidence 803(2) creates a hearsay[3] exception for "statement[s] relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." FED. R. EVID. 803(2).[4] The rationale underlying the "excited utterance" exception is that "excitement suspends the declarant's powers of reflection and fabrication, consequently minimizing the possibility that the utterance will be influenced by self interest and therefore rendered unreliable." *United States v. Brown*, 254 F.3d 454, 458 (3d Cir. 2001), *cert. denied*, 535 U.S. 944 (2002); *see also United States v. Joy*, 192 F.3d 761, 766 (7th Cir. 1999) ("This exception is premised on the belief that a person is unlikely to fabricate lies (which presumably takes some deliberate reflection) while his mind is preoccupied with the stress of an exciting event."), *cert. denied*, 530 U.S. 1250 (2000). Thus, to qualify as an excited utterance, "the declarant's state of mind

---

[3] Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. FED. R. EVID. 801(c). The statement is not admissible unless an exception to the hearsay rule applies. FED. R. EVID. 802.

[4] The applicability of the excited utterance exception is unaffected by the availability or unavailability of the declarant as a witness. FED. R. EVID. 803.

at the time that the statement was made [must] preclude[ ] conscious reflection on the subject of the statement." *Joy*, 192 F.3d at 766.

For a statement to qualify as an excited utterance, the proponent of the exception must establish: (1) the occurrence of a startling event; (2) that the declarant made the statement while under the stress of excitement caused by the event; and (3) that the declarant's statement relates to the startling event. *See, e.g.*, *Brown*, 254 F.3d at 458; *Joy*, 192 F.3d at 766.[5] Yet, unlike the hearsay exception for present sense impressions, FED. R. EVID. 803(1), "[a]n excited utterance need not be contemporaneous with the startling event to be admissible," *United States v. Tocco*, 135 F.3d 116, 127 (2d Cir.), *cert. denied*, 523 U.S. 1096 (1998). "Rather, the utterance must be contemporaneous with the excitement engendered by the startling event." *Joy*, 192 F.3d at 766.[6]

Although the lapse of time between the startling event and the declarant's statement is relevant to whether the declarant made the statement while under the stress of excitement, the temporal gap between the event and the utterance is not itself dispositive. *See United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002). Other relevant factors include: the characteristics of the event; the subject matter of the statement; whether the statement was made in response to an inquiry; and the declarant's age, motive to lie and physical and mental condition. *See United States v. Marrowbone*, 211 F.3d 452, 454–55 (8th Cir. 2000). If the trial court has access

---

[5] The proponent must establish these three elements by a preponderance of the evidence. *See United States v. Collins*, 60 F.3d 4, 8 (1st Cir. 1995) (citing *Huddleston v. United States*, 485 U.S. 681, 690 (1988)); *see also United States v. Woodfolk*, 656 A.2d 1145, 1150 n.14 (D.C. 1995), *cert. denied*, 516 U.S. 1183 (1996).

[6] Because the excited utterance exception is based upon "the *psychological impact* of the event itself" and not upon the contemporaneity of the startling event and the declarant's statement, the exception "permits [the] admission of a broader range of hearsay statements [than the hearsay exception for present sense impressions]." *United States v. Jones*, 299 F.3d 103, 112 n.3 (2d Cir. 2002) (emphasis in original).

to a recording of the declarant's statement, it may also consider the declarant's "tone and tenor of voice" in determining whether the declarant made that statement while under the stress of excitement. *United States v. Woodfolk*, 656 A.2d 1145, 1151 n.16 (D.C. 1995) (collecting cases), *cert. denied*, 516 U.S. 1183 (1996).

Here, Alexander contends that the district court erred in concluding that Young's statements during the 911 call[7] were made while under the stress of excitement.[8] Specifically, Alexander maintains that the passage of time between the alleged threats and the 911 call; Young's intervening telephone call to her mother; and Young's tone of voice during the 911 call—when considered together—negate a finding that the statements were made while under the stress of excitement.[9] Alexander's arguments address us as if we were deciding the question anew. Whatever we might decide on *de novo* review, we cannot conclude that the district court abused its discretion in admitting the 911 call. *See Evans*, 216 F.3d at 85.

[7] Young's statement that Alexander "[has] a gun on him now" is not rendered inadmissible simply because it was made in response to the dispatcher's question. *See Joy*, 192 F.3d at 767 (fact that declarant answered dispatcher's questions, rather than giving spontaneous narrative, did not disprove excitement); *see also United States v. Glenn*, 473 F.2d 191, 194 (D.C. Cir. 1972) ("Declarations relating to the circumstances of a violent crime, made by the victim shortly after its occurrence . . . may be admissible although made in response to an inquiry.").

[8] Alexander does not dispute (1) that the alleged threats constituted a startling event or (2) that Young's statements related to that startling event. *See* Br. for Appellant at 13–16.

[9] Relying on Young's voir dire testimony, Alexander also argues that the 911 call lacks sufficient indicia of reliability because Young "in fact lied" about Alexander having a gun. Br. for Appellant at 15. This argument fails. Young's subsequent statements "made well after her 911 call are not part of the core evaluation whether the statements made during the 911 call qualified as an excited utterance when made." *Malloy v. United States*, 797 A.2d 687, 690 (D.C. 2002).

According to Young's grand jury and voir dire testimony, she telephoned 911 approximately 15 to 20 minutes after the alleged threats. 2/6/01 Tr. 97, 115. Considering the nature of the startling occurrence—Alexander allegedly had a gun and threatened both to "do something" to Young and to "mess [up]" her apartment—the passage of 15 to 20 minutes hardly suggests that the district court abused its discretion in admitting the 911 call. *See, e.g., United States v. Phelps*, 168 F.3d 1048, 1055 (8th Cir. 1999) ("The lapse of 15 to 30 minutes between an exciting incident and a statement does not render the statement inadmissible."); *United States v. Golden*, 671 F.2d 369, 371 (10th Cir.) (statement occurring within 15 minutes of startling event and immediately after high-speed flight admissible), *cert. denied*, 456 U.S. 919 (1982). On the contrary, depending upon the other factors in the "excitement" inquiry, courts of appeals have upheld the admission of statements made even several hours after the startling event. *See, e.g., Tocco*, 135 F.3d at 127–28 (statement of "all hyped" and "nervous" declarant admitted although made three hours after deadly fire).

The fact that Young telephoned her mother during this 15 to 20 minute interval does not, in our view, change the calculus. Although the intervening call might suggest that Young had time to reflect and deliberate before calling 911, the nature of Alexander's threats, the relatively short lapse of time between those threats and the 911 call and the recipient of Young's initial call—her mother—all lend support to the district court's ruling. Given that the courts have upheld the admission of statements made even hours after a startling event—and we can reasonably assume that the declarants in such cases likely did not remain silent in the intervening hours—Young's telephone call to her mother fails to establish that she was not under the stress of excitement when she then called 911.

Alexander's strongest argument for reversal lies with the "tone and tenor" of the 911 call itself. "Ms. Young's tone of voice on the call was monotone and calm," Alexander maintains, "demonstrating that she was not still under the stress

of excitement from any alleged threats." Br. for Appellant at 14. To be sure, Young's tone of voice deviated from the monotone only when she became irritated with the dispatcher for refusing to send the police to her apartment. The district court rejected Alexander's argument, however, concluding that "[i]t is clear she's upset on that telephone call." 2/6/01 Tr. 143. We will not disturb the district court's ruling.

Although Young sounded composed for most of the 911 call, she became agitated when the dispatcher informed her that the police would not go to her apartment because she had given Alexander a set of keys to the apartment. Alexander would have us conclude that Young's sudden burst of "excitement" conclusively established her lack of excitement earlier in the call, namely, when she indicated that Alexander had "a gun on him now." But Schaffrath's testimony that Young appeared "stressed, afraid, [and] frightened" fifteen minutes after the 911 call adequately supports the district court's conclusion that Young made the call while under the stress of excitement. *Id.* at 155. We therefore conclude that the district court did not abuse its discretion in admitting Young's 911 call.[10]

### B. The "Other Acts" Evidence

Next, Alexander argues that the district court erred in admitting prejudicial "other acts" evidence at trial, namely, Young's statement on the 911 call that Alexander "[has] a gun on him now." Because Alexander did not raise a Rule 404(b) objection to the introduction of the 911 call below,[11] we review

---

[10] Alexander asserts that the district court's decision to admit the 911 call as an excited utterance contradicts its decision to exclude Young's subsequent statements to Schaffrath at the scene. This argument is meritless. Plainly, the district court did not abuse its discretion in finding that Young made the former statement—but not the latter—while under the stress of excitement; after all, Young's statements to Schaffrath at the scene were made later and under circumstances different from the 911 call.

[11] Alexander did object to the government's opening statement on Rule 404(b) grounds, arguing that the government violated the

his "other acts" challenge for plain error. *See United States v. Smart*, 98 F.3d 1379, 1390 n.12 (D.C. Cir. 1996), *cert. denied*, 520 U.S. 1128 (1997).[12] However, we find no error—

---

district court's earlier ruling that "there would be no mention of a prior possession of a pistol observed by Ms. Young in [the] opening." 2/6/01 Tr. 44. Although Alexander claims that "a review of the entire argument between the government's opening statement and [defense counsel's] opening statement demonstrates that [the Rule 404(b) objection] centered around all evidence from Ms. Young regarding possession of a gun, including the 911 call," Reply Br. at 8, the record fails to support Alexander's claim, *see* 2/5/01 a.m. Tr. 45–65; 2/6/01 Tr. 44–53.

To begin with, Alexander did not contend that Young's statements on the 911 call constituted "other acts" evidence at the Rule 404(b) hearing. *See* 2/5/01 a.m. Tr. 45–65. The hearing addressed, among other Rule 404(b) issues, whether Young could testify at trial that she had seen Alexander on earlier occasions with a gun similar to the one found in the brown Buick. *Id.* at 46–48. The district court ruled that Young's testimony would not constitute Rule 404(b) evidence so long as she could testify that the gun she previously observed in Alexander's possession looked "terribly similar" to the gun in the Buick. *Id.* at 62.

More importantly, Alexander did not object to the government's reference to the 911 call during the bench conference that followed his Rule 404(b) objection at trial. *See* 2/6/01 44–53. Alexander's objection to the government's opening statement centered on the government's discussion of Young's expected testimony, that is, the testimony the district court addressed at the Rule 404(b) hearing. *See id.* Although Alexander subsequently moved "to strike the excited utterance" when it became apparent that Young would not testify at trial, he did not base his motion to strike on Rule 404(b). 2/7/01 a.m. Tr. 27.

[12] To meet the plain error standard, "there must be (1) error, (2) that 'affect[s] substantial rights'—*i.e.*, that is prejudicial . . . and the error must also be 'plain.'" *United States v. Perkins*, 161 F.3d 66, 72 (D.C. Cir. 1998) (quoting FED. R. CRIM. P. 52(a)) (footnote omitted). If these three conditions are met, "an appellate court may then exercise its discretion to notice a forfeited error, but only if [ ] the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467 (1997) (internal quotations omitted). On plain error

plain or otherwise—in the district court's admission of the 911 call because Young's statement that Alexander "[has] a gun on him now" does not constitute "other acts" evidence within the meaning of Rule 404(b).

Federal Rule of Evidence 404(b) prohibits the admission of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." FED. R. EVID. 404(b). Such evidence may be admissible, however, if offered for purposes unrelated to the defendant's propensity to commit crime, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* If the government plans to introduce "other acts" evidence at trial, it must, "upon request by the accused, . . . provide reasonable notice in advance of trial . . . of the general nature of any such evidence." *Id.*

"[B]ecause Rule 404(b) applies only to evidence of a defendant's '*other* crimes, wrongs, or acts,'" several of our sister circuits have held that the rule "creates a dichotomy between crimes or acts that constitute the charged crime and crimes or acts that do not." *United States v. Bowie*, 232 F.3d 923, 927 (D.C. Cir. 2000) (emphasis in original) (collecting cases). These courts have reasoned that Rule 404(b) applies only to "extrinsic" evidence of other crimes and not to "intrinsic" evidence of the same crime. *Id.* at 927–29; *see, e.g.*, *United States v. Towne*, 870 F.2d 880, 886 (2d Cir.) ("The continuous possession of the same gun does not amount to a series of crimes, but rather constitutes a single offense."), *cert. denied*, 490 U.S. 1101 (1989). Although we have recently expressed our dissatisfaction with the extrinsic-intrinsic distinction,[13] *see*

---

review, the defendant bears the burden of persuasion with respect to prejudice. *Perkins*, 161 F.3d at 72 n.6.

[13] Given the practical and definitional problems that plague the extrinsic-intrinsic distinction, we have called into question the need for such distinction: "If the so-called 'intrinsic' act is indeed part of the crime charged, evidence of it will, by definition, always satisfy Rule 404(b). The rule bars bad acts evidence only when the evidence is offered solely to 'prove the character of a person in

*Bowie*, 232 F.3d at 927–29, we have nonetheless recognized that "at least in a narrow range of circumstances . . . evidence can be 'intrinsic to' the charged crime," *id.* at 929. For example, if evidence is offered as direct evidence of a fact in issue, not as circumstantial evidence requiring an inference regarding the character of the accused, "it is properly considered intrinsic." *Id.* (citing *United States v. Badru*, 97 F.3d 1471, 1474–75 (D.C. Cir. 1996), *cert. denied*, 520 U.S. 1150, *and cert. denied*, 520 U.S. 1213 (1997)).

Here, Young's statement that Alexander "[has] a gun on him now" constituted intrinsic, admissible evidence on the felon-in-possession charge.[14] *See United States v. Bradley*, 145 F.3d 889, 891–94 (7th Cir. 1998) (declarant's excited utterance during 911 call that "[h]e pulled a gun on me" provided relevant, probative evidence of defendant's knowing possession of firearm and ammunition); *Woodfolk*, 656 A.2d at 1151 n.17 (declarant's excited utterance during 911 call that her boyfriend had gun was "directly relevant to the crime at issue, linking appellant to the gun").[15] Although Alexander contends that the 911 call established only that Young knew that Alexander possessed "some gun at some point," Br. for Appellant at 20, and thereby invited the jury to make an impermissible propensity inference regarding Alexander's character, the record indicates otherwise.

---

order to show action in conformity therewith.' Evidence that constitutes the very crime being prosecuted is not of that sort." *Bowie*, 232 F.3d at 927 (quoting Fᴇᴅ. R. Eᴠɪᴅ. 404(b)).

[14] As an aside, Alexander's assorted "severance" claims are without merit. First, Alexander never moved to sever the felon-in-possession charge from the threat charge. *See* 2/6/01 Tr. 49–53. Second, the district court did not limit the admission of the 911 tape to the threat charge. *See* 2/5/01 a.m. Tr. 59–62; 2/5/01 p.m. Tr. 174; 1/7/02 a.m. Tr. 24–25.

[15] Alexander attempts to distinguish *Bradley* and *Woodfolk* by arguing that "in those cases additional evidence connected the gun referred to on the 911 call to the charged gun." Reply Br. at 10. While Alexander is correct on the factual distinction, neither decision turned on the existence of such "additional evidence." *See Bradley*, 145 F.3d at 892–94; *Woodfolk*, 656 A.2d at 1151 n.17.

After Young told the dispatcher that Alexander had a gun, the dispatcher asked: "He got a gun on him now?," to which Young responded, "Yeah." Thus, as the government correctly observes, Young's statement served "not [as] evidence of a prior possession, or possession at some point," but instead as "evidence of [Alexander's] current possession, the possession for which [Alexander] was arrested minutes later, and for which he was charged." Br. for Appellee at 31. In other words, Young's statement provided only "intrinsic" evidence of the crime charged, not "extrinsic" evidence inviting an inference regarding Alexander's bad character.[16] Accordingly, we conclude that the district court did not err in admitting Young's statement on the 911 call that Alexander "[has] a gun on him now."[17]

## C. Sufficiency of the Evidence

Alexander contends that, "[v]iewing the evidence in the light most favorable to the government, no reasonable juror could reasonably conclude beyond a reasonable doubt that [he] possessed the gun at issue here." Br. for Appellant at 8. According to Alexander, the government presented—at best—evidence of "mere proximity," *i.e.*, that the police discovered a Colt revolver in a car registered to Alexander, Alexander possessed keys to the car at the time the police discovered the weapon and Alexander received a citation

---

[16] Even if Young's statement had constituted extrinsic "other acts" evidence—which it did not—it is our view that the district court's admission of the statement would not have constituted plain error. *See United States v. Cassell*, 292 F.3d 788, 794–95 (D.C. Cir. 2002) ("A prior history of intentionally possessing guns, or for that matter chattels of any sort, is certainly relevant to the determination of whether a person in proximity to such a chattel on the occasion under litigation knew what he was possessing and intended to do so.").

[17] Because Young's statements on the 911 call did not constitute "other acts" evidence within the meaning of Rule 404(b), we likewise conclude that the government did not misuse the evidence in its closing statement. *See* 2/7/01 p.m. Tr. 27, 37–38.

while driving the car more than two months before his arrest. *Id*. at 9. We reject this argument.

"In considering a defendant's challenge to the sufficiency of the evidence, we review the evidence of record *de novo*, considering that evidence in the light most favorable to the government, and affirm a guilty verdict where '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir.) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)), *cert. denied*, 123 S. Ct. 247 (2002). In performing this task, "[w]e draw no distinction between direct and circumstantial evidence." *United States v. Moore*, 104 F.3d 377, 381 (D.C. Cir. 1997).

Criminal possession of a firearm may be either actual or constructive.[18] *Wahl*, 290 F.3d at 376; *Moore*, 104 F.3d at 381. For constructive possession, the evidence must establish that "the defendant 'had the ability to exercise knowing dominion and control over the items in question.'" *Wahl*, 290 F.3d at 376 (quoting *United States v. Morris*, 977 F.2d 617, 619 (D.C. Cir. 1992) (internal quotations omitted)). Although "mere proximity" to a gun is insufficient to establish constructive possession, "'evidence of some other factor—including connection with a gun, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise—coupled with proximity may' suffice." *Moore*, 104 F.3d at 381 (quoting *United States v. Gibbs*, 904 F.2d 52, 56 (D.C. Cir. 1990)).

In our view, sufficient evidence supports the jury's conclusion that Alexander constructively possessed the Colt revolver found in the brown Buick parked outside Young's workplace. As earlier discussed, Young's 911 call indicated that

---

[18] To convict a defendant of unlawful possession of a firearm under 18 U.S.C. § 922(g)(1), the government must prove beyond a reasonable doubt that: (1) the defendant knowingly possessed a firearm; (2) the firearm was transported in or affected interstate commerce; and (3) at the time of his possession, the defendant had been convicted of a felony. 18 U.S.C. § 922(g)(1) Here, the parties stipulated to the last two elements. 2/7/01 a.m. Tr. 66–67.

Alexander had "a gun on him now" just minutes before the police discovered the weapon lying on the Buick's driver's side floorboard. The registration and traffic citation recovered from the car's glove compartment—as well as the keys recovered from Alexander's person at the scene—established that Alexander owned and operated the vehicle. Given the distance between Alexander's abode and Young's workplace (approximately 10 to 14 blocks), the jury could have reasonably concluded that Alexander had driven the Buick to the scene. Moreover, the jury could have reasonably concluded that the baseball cap found lying on the passenger's seat made it more likely that a male had driven the car most recently and that no one had been sitting in the passenger's seat when the driver parked outside the group home. Finally, Alexander's threatening statements to Young provided a motive for his possession of the revolver. *See Moore*, 104 F.3d at 381 (evidence of motive relevant to sufficiency inquiry).

Alexander's challenge to the sufficiency of this evidence is unpersuasive. Although Alexander correctly observes that the discovery of a gun in a car owned and operated by the defendant is insufficient, standing alone, to establish possession, *see, e.g.*, *Moore*, 104 F.3d at 381, the government offered additional, persuasive evidence of Alexander's possession: Young's statement that Alexander had "a gun on him now" and that he had threatened to "do something" to her. The additional evidence—coupled with Alexander's "proximity" to the Buick in which the revolver was found—suffices, in our view, to support the jury's verdict.[19] Although Alexander

---

[19] Relying on *United States v. Clark*, 184 F.3d 858 (D.C. Cir. 1999), Alexander argues that the evidence against him was insufficient because there was no evidence that he had been seen near, or making gestures towards, the recovered gun. Although we held in *Clark* that the defendant's "reaching actions" were sufficient to link him to the recovered gun—when asked for his driver's license and registration, Clark twice reached towards the floorboard behind his seat where the police ultimately discovered the gun—we did not establish, as Alexander seems to suggest, a "gesture requirement" for constructive possession. *Id*. at 862–65.

maintains that Young's statement on the 911 call cannot be considered in weighing the sufficiency of the evidence, he is mistaken. As already noted, *see supra* Part II.A–B, the district court properly admitted Young's statement. Moreover, we must consider all admitted evidence—whether admitted erroneously or not—in reviewing the sufficiency of the evidence. *See Lockhart v. Nelson*, 488 U.S. 33, 39–42 (1988). Accordingly, Alexander's sufficiency challenge fails.

### D. Motion for a New Trial

Alexander also argues that the district court erred in denying his motion for a new trial. Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). Here, Alexander claims that three prejudicial errors warranted a new trial: (1) the government's opening statement included allegations it ultimately failed to prove as a result of Young's refusal to testify; (2) Officer Reynolds testified to inadmissible hearsay before the jury, namely, that Young pointed to the brown Buick and stated that it belonged to Alexander; and (3) the government's closing argument misused Young's statement on the 911 call. In reviewing the district court's denial of Alexander's motion for a new trial, "we apply a deferential standard, and will reverse only if the court abused its discretion or misapplied the law." *United States v. Lafayette*, 983 F.2d 1102, 1105 (D.C. Cir. 1993).[20]

---

Alexander's emphasis on his lack of "evasive action" is similarly misplaced. While we have found evidence of evasive action relevant in constructive possession cases, such action—or lack thereof—is hardly determinative. *See, e.g.*, *United States v. Jenkins*, 981 F.2d 1281, 1284 (D.C. Cir. 1992) (collecting "evasive action" cases) (defendant's flight upon seeing uniformed officers "not particularly probative" of constructive possession because defendant ran towards vehicle where illegal gun was located).

[20] The government argues that we should review the district court's denial of Alexander's new trial motion for plain error, citing *United States v. Thompson*, 27 F.3d 671 (D.C. Cir.), *cert. denied*, 513 U.S. 1050 (1994). The government is mistaken. In *Thompson*,

Finding no abuse of discretion here, we reject Alexander's arguments.[21]

In its opening statement, the government told the jury that it would hear evidence that Young told the police that Alexander had a revolver, that Young described the revolver as having a brown handle and that the police found a revolver matching that description in Alexander's car. 2/6/01 Tr. 39–44. Young then refused to testify at trial and the district court instructed the jury at the close of the evidence to "disregard the claims or statements made by the lawyers in the openings if [they were] not proven in evidence." 2/7/01 a.m. Tr. 77. Additionally, the district court further instructed the jury not to speculate about Young's absence nor "to draw any adverse inference against either party" because she did not testify. *Id.*

To determine whether a prosecutor's opening statement substantially prejudiced a defendant's trial, we consider the severity of the alleged misconduct, the curative measures taken and the certainty of conviction absent the improper remarks. *United States v. Thomas*, 114 F.3d 228, 246 (D.C. Cir.), *cert. denied*, 522 U.S. 1033 (1997). Plainly, the district court did not abuse its discretion in denying Alexander's new

we explained that "[f]or purposes of determining our standard of review of an alleged error in admission of evidence ... a post-verdict motion for a new trial is not the same as a timely objection: the delay eliminates any chance that the judge could correct the error without a duplicative trial, and according review as if a timely objection had been raised virtually invites strategic behavior by defense counsel." *Id.* at 673. Thus, where the defendant did not timely object at trial, we held that we will review post-trial for plain error only. *Id.* Unlike the defendant in *Thompson*, however, Alexander timely objected to each of the alleged errors included in his post-trial motion. *See* 2/6/01 Tr. 44–53 (government's opening statement); 2/6/01 Tr. 202 (hearsay objection); 2/7/01 p.m. Tr. 66–67 (government's closing argument).

[21] Having concluded that the government did not misuse Young's statements on the 911 call either in its closing statement or in Alexander's trial generally, *see supra* note 17 and accompanying text, we focus on Alexander's other claimed errors.

trial motion. As the district court noted, both the govern-
ment and defense counsel "made a lot of statements" about
Young's expected testimony in their respective openings.[22]
1/7/02 Tr. 28. As an initial matter, we are loath to question
the district court's conclusion that the government made its
opening statement in good faith. *Id.* at 27. The district
court also specifically instructed the jury on Young's absence.
2/7/01 a.m. Tr. 77–78. In our view, the instruction cured any
evidentiary problem created by Young's refusal to testify.
*See United States v. White*, 116 F.3d 903, 917–18 (D.C. Cir.)
(jurors presumed to follow court's instructions), *cert. denied*,
522 U.S. 960 (1997).

Alexander's reliance on the stricken hearsay testimony of
Officer Reynolds is similarly misplaced. Reynolds testified at
trial that Young pointed to the brown Buick and stated that it
belonged to Alexander. The district court sustained Alexan-
der's objection, however, informing the jury that "the last
answer is stricken. And that means it's out of the record.
Don't consider it." 2/6/01 Tr. 204. Given the cumulative
nature of Reynolds's testimony—the registration and traffic
citation amply established Alexander's connection to the
Buick—we believe the district court's instruction cured any
prejudice Reynolds's hearsay testimony may have caused.
*See White*, 116 F.3d at 917–18. Accordingly, we conclude that
the district court did not abuse its discretion in denying
Alexander's motion for a new trial.

### *E. The Mandatory Minimum Sentence*

Finally, Alexander challenges the district court's imposition
of a mandatory minimum sentence of fifteen years of impris-
onment pursuant to 18 U.S.C. § 924(e)(1). Specifically, Alex-
ander argues that the district court erred in concluding that
his 1991 conviction for attempted possession with intent to

---

[22] Defense counsel told the jury in his opening statement that
Young told the police that (1) the brown Buick in which the police
found the Colt revolver belonged to her; (2) Alexander drove a 1985
burgundy Mercedes; and (3) Alexander drove the Mercedes when
he left her workplace earlier that day. 2/6/01 Tr. 55–56.

distribute qualifies as a "serious drug offense" under 18 U.S.C. § 924(e)(2)(A)(ii) and that, as a result, the district court erred in imposing the mandatory minimum.[23] Reviewing Alexander's claim *de novo*, *see, e.g., United States v. Gaviria*, 116 F.3d 1498, 1518 (D.C. Cir. 1997) ("Legal questions relating to sentencing are reviewed *de novo*."), *cert. denied*, 522 U.S. 1082 (1998), we find no error in Alexander's sentence.

Section 924(e)(1), in pertinent part, directs that a defendant convicted under 18 U.S.C. § 922(g) be sentenced to a mandatory minimum term of fifteen years if he "has three previous convictions . . . for a violent felony or a serious drug offense, or both, committed on occasions different from one another." 18 U.S.C. § 924(e)(1). As used in section 924(e), a "serious drug offense" includes, *inter alia*, "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law." *Id.* § 924(e)(2)(A)(ii).

Emphasizing the fact that section 924(e)(2)(A)(ii) does not expressly include attempts within the definition of "serious drug offense," Alexander argues that his prior conviction for attempted possession with intent to distribute cannot be used as a qualifying conviction. "Had [the] Congress intended to include[ ] attempted drug offenses within the definition of serious drug offenses," Alexander contends, "[the] Congress would have specifically done so, as it did in the definition of violent felon[ies] under [section 924(e)(2)(B)]." Br. for Appel-

---

[23] Alexander does not challenge two of his qualifying convictions: a 1972 conviction for armed robbery and a December 1977 conviction for bank robbery. *See* Br. for Appellant at 29–30. Although Alexander's brief discussed a fourth conviction—a July 1977 conviction for bank robbery—the district court did not consider, and the government did argue on appeal, whether Alexander's July 1977 conviction qualified as the third required conviction under 18 U.S.C. § 924(e)(1). We do likewise.

lant at 30–31. Violent felonies are defined, in relevant part, as "any crime punishable by imprisonment for a term exceeding one year . . . that (i) has as an element the use, *attempted* use, or threatened use of physical force against the person of another[ ] or (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B) (emphasis added).

We reject Alexander's reading of the statute. *See United States v. King*, 325 F.3d 110 (2d Cir. 2003) (prior conviction for attempt to commit third-degree possession of controlled substance qualified as "serious drug offense"). As the government correctly observes, the Congress defined the terms "violent felony" and "serious drug offense" in decidedly different manners. Unlike the definition of "violent felony," the definition of "serious drug offense" does not speak in specifics; instead, it defines the term to include an entire class of state offenses "involving" certain activities, namely, "manufacturing, distributing, or possessing with intent to manufacture or distribute" a controlled substance. 18 U.S.C. § 924(e)(2)(A)(ii). Noting that "[t]he word 'involving' has expansive connotations," the Second Circuit recently observed that the term "must be construed as extending the focus of § 924(e) beyond the precise offenses of distributing, manufacturing, or possessing, and as encompassing as well offenses that are related to or connected with such conduct." *King*, 325 F.3d at 113; *see also United States v. Brandon*, 247 F.3d 186, 190 (4th Cir. 2001) ("[T]he word 'involving' itself suggests that the subsection should be read expansively." (internal citation omitted)). We find the Second Circuit's analysis to be sound.

Moreover, as the district court recognized, the use of "attempted" in section 924(e)(2)(B)(i) does not—by itself—indicate that the Congress intended to exclude attempt convictions from the definition of "serious drug offense[s]" in section 924(e)(2)(A)(ii). 1/7/02 Tr. 47–48. Indeed, well-established principles of statutory construction counsel otherwise; if we were to adopt Alexander's reading of section 924(e)(2)(A)(ii), the term "involving" would be rendered mean-

ingless—"distribution alone would qualify as a crime 'involving' distribution" and possession with intent to distribute alone would qualify as a crime "involving" possession with intent to distribute. *United States v. Contreras*, 895 F.2d 1241, 1244 (9th Cir. 1990) (rejecting argument that possession with intent to distribute is not crime "involving" distribution). Because Alexander's earlier conviction of attempted possession "involv[ed]" possession with intent to distribute a controlled substance and, in addition, carried a maximum term of imprisonment of more than ten years, we conclude that the district court properly imposed a mandatory minimum sentence under 18 U.S.C. § 924(e)(1).

For the foregoing reasons, we conclude that all of Alexander's contentions are without merit. Accordingly, the judgment of the district court is

*Affirmed.*